And next. And we will go on to 1830-29 James Pennewell v. James Parish. Yeah. Hey. And it's Mr. Petrie. Did you want to take some water? Go ahead. Check and see if that's Jim. What? Check and see if that's Jim. Good morning. Good morning, Mr. Petrie, and I represent James Pennewell, a Wisconsin citizen who was imprisoned for a DUI and who then went blind while in the care of Wisconsin's correction system. On appeal today, I have two arguments. First, that the district court abused its discretion by refusing to appoint counsel for Mr. Pennewell. And second, that summary judgment was inappropriate given the numerous disputes of material fact in the record below. Before addressing the briefing on the issue of jurisdiction and that all parties agreed in their brief that this court does have jurisdiction, I'm happy to answer any questions on that issue if there are any. But otherwise, turning to my first argument, because Mr. Pennewell made reasonable attempts to obtain counsel on his own, the appointment of counsel issue really depends on whether he was competent to litigate this case on his own. And under this court standard laid out in Pruitt v. Moat, that requires a district court to conduct an individualized assessment based on the totality of the circumstances. So, the district court in this case, under this court's precedent, was required to consider the specific circumstances and characteristics that Mr. Pennewell faced and the specific facts of the case at hand. Now, you relied on our case in James v. Eli. But in that case, the plaintiff repeatedly renewed his request for counsel and we held that at the more advanced stages of litigation, where a plaintiff faces an increasingly complex set of demands, the district court had to closely consider the to meet those demands. Now, isn't this case different in that the denial came at the very early stage of litigation and the court made clear that the request was only denied at that time and that the denial was without prejudice? That is true, Your Honor, but this case should be controlled by Santiago v. Waltz, in which this court found an abuse of discretion because the district court issued an order with definitive language, essentially telling the plaintiff that the district court did not intend to revisit the appointment of counsel issue. The order here was the functional equivalent. The district court laid out a roadmap for discovery and summary judgment and effectively told Mr. Pennewell to go off, conduct all stages of pretrial litigation, and only come back to the appointment of counsel issue later at trial. And so this court, because it held that order in Santiago to be an abuse of discretion, the order here in this case, which is, again, the functional equivalent, is also an abuse of discretion. And moreover, this court held in the Armstrong case that we cite in our brief that the Pruitt inquiry applies at the pleading stage as well. There's simply no excuse for a district court to ignore the standard that this court laid out in Pruitt, which requires an individualized assessment. The district court in this case used boilerplate language that could have applied to any plaintiff in virtually any case. It did not apply the legal standard that this court's precedent requires in James v. Eli and DeWitt v. Corazon, and that was an abuse of discretion. Now, in his complaint, Pennewell first specified foggy vision and then later mentioned loss of vision. But what would have alerted the defendants that the complaint of loss of vision was distinct from the foggy vision attributed to the cataract or the decreased vision attributed to the need for a new eyeglass prescription? See, in order to show deliberate indifference, doesn't he have to show that the defendants were aware of the type of loss of vision that would indicate a retinal detachment? In other words, what I'm trying to get to here is what evidence is sufficient to create an issue of fact as to deliberate indifference as opposed to mere negligence? Well, in this case, you effectively have a he said versus they said. In Mr. Pennewell's verified sworn complaint, which constituted an affidavit of summary judgment, Mr. Pennewell presented evidence that went to when Dr. Richter and P.A. Parrish and Nurses Jackson and Bruns knew that he was complaining of loss of vision and flashes of light. And as Dr. Michael Altweil's declaration, which the defendants themselves introduced below, the doctor argued or claimed that those two symptoms, flashes of light and loss of vision, are the telltale symptoms of a detached retina that requires immediate emergency treatment. And so here you have in Mr. Pennewell's complaint, he swore in his complaint that he told the defendants of these symptoms. And yet in the defendants' self-serving notes and declarations, they present a different set of facts claiming that they didn't know of these symptoms until April 6th. But that in and of itself is a dispute of material fact. And of course, on April 6th, when he complained of the lower field vision, as I recall, they sent him immediately to the emergency room, had surgery the next day. Yes. For retinal detachment. And there's no reason that that shouldn't have happened on March 30th, when Mr. Pennewell told Nurse Jackson about feeling a tear in his eye and severe pain. Or on March 17th, when he told Nurses Jackson and Bruns and others about flashes of light and loss of vision. Or on April 11th, when he told Dr. Richter and P.A. Parrish. So again, this is a classic he said versus they said. And regardless of which side is more credible, that wasn't a determination for the district court to make. That should have gone to a jury. And it was inappropriate for the district court in this case to grant summary judgment for the defendants. Indeed, if you look at page 12 of the district court's summary judgment order, the district court stated that the defendant's version of the facts is, quote, entirely possible. That is not the summary judgment standard. Summary judgment requires all reasonable inferences in favor of the non-movement, which is Mr. Pennewell in this case. And because in his sworn verified complaint, which again under this court's precedent constitute an affidavit and therefore presented evidence, every claim in his complaint within his personal firsthand knowledge is evidence that refutes the defendant's self-serving notes and declarations. And so it was inappropriate for the district court to not conduct the Pruitt inquiry on the appointment of counsel issue and inappropriate for the district court to grant summary judgment. If this were sent back to have the court determine what should have been done about appointing counsel, what can be done now? New trial, or a trial, never had one. Yes, sir. And people like you would be representing him. Well, unfortunately, Wisconsin doesn't let out-of-state students argue, but I'd be happy to... You've got a bench full over there. But we do argue that Mr. Pennewell deserves a trial with counsel in the case below. Thank you. Are you a senior? Yes, Your Honor. Okay. Maybe you'll be out. All right. Maybe you'll actually graduate. Okay. Good morning, Your Honors. I'm Assistant Attorney General Colin Roth from the Wisconsin Department of Justice on behalf of FLEs. And I will say, if I could change the rules, I would let him represent them. Unfortunately, I don't have that power. So I'll start first with the appointment of counsel issue. I think Your Honors are absolutely right. You put your finger on the issue when you identified why this case is distinct from some of the others in which this court did find an abuse of discretion. And that's because this was a pro se. Once a judge refuses the request twice, he very well might have believed he would be prejudiced if he kept requesting appointed counsel. I mean, who wants to annoy a judge? Well... Except all of you. Fair enough. Except I don't think that's the standard that this court has set out. And that's from both McCaw and James V. Elias. Would you concede that there was a triable question of fact? Oh, I don't think so, Your Honor. I think on the Eighth Amendment issue, all the evidence in the record here points in one direction, and that's that the DOC clinicians here responded promptly to Mr. Pennewell's request for care on multiple occasions. When they did perceive him to be reporting emergency symptoms, they sent him directly to UW for surgery. I mean, this happened on two different occasions. I think he was sent for emergency care the same day he reported symptoms. He got surgery. So, I mean, when they did perceive an emergency situation, that's what they did. And I think there's no evidence in the record that they perceived emergency symptoms on any of these other encounters. Except that shouldn't his complaints be considered in light of his prior history and the fact that he lost his eyesight in the other eye due to a retinal detachment? And in that context, shouldn't any complaints of flashing lights, vision difficulties have triggered an examination for retinal detachment such as the failure to see? Well, I think what's important to keep in mind here is when he first came into custody, he saw a specialist, and Dr. Richter, who will be speaking next, and that specialist, you know, listened to the symptoms that he reported and simply scheduled him for a follow-up appointment at an eye clinic approximately, I think, a month and a half, perhaps two months later was his Mr. Penwell then reported to these non-specialists at DOC about, you know, his chronic eye issues. And in their view, they reviewed the record. They reviewed his medical record and saw that he had seen a specialist to discuss these problems that he had been having for some time, as you pointed out. And then when they saw in the record that after seeing a specialist, an optometrist, that specialist, you know, didn't think that there was a need for an emergency eye surgery or anything like that. I think they're entitled to defer to a specialist course of treatment. I think that's clear. And in my view, that's what they did. I think even accepting the sort of allegations and his complaint about what he said to these DOC clinicians, they're, you know, even accepting that as true, I still don't think there's anything in the record that shows that they understood this to be an emergency situation. And I would also point you to the declaration of Dr. Altaweil, who's an ophthalmologist and not a defendant in this case. He's not a defendant. But he said when he reviewed the, you know, the entire course of records and treatment in this case, he did not see any evidence that any DOC clinicians failed to meet the applicable standard of care. He saw no problem here. And he's not an interested party. He's, again, a third-party ophthalmologist at the University of Wisconsin who reviewed the records. So, you know, I think if you're looking at, you know, the evidence in the record, which is all we can do at this stage, it's a high standard. Deliberative difference is a high standard. It's not, you know, could you have made a different decision? You have to fall substantially below the standard of care to satisfy deliberate indifference claim. And I think here, the subjective prong of that claim, what was inside these DOC clinicians' minds when they saw Mr. Pennewell, I think there's simply no evidence that they buried their heads in the sand, which is effectively what you need to show to prove up a deliberate indifference claim. Again, they knew he had seen a specialist. They knew that he had an appointment upcoming for his eye problems. They saw him the day of, you know, he made multiple requests to be seen in the health services unit. And each time he was seen the same day or I think maybe once the day after. I mean, these were prompt responses to his request for care and responses that did include a couple times same-day surgeries. So it's not as if these defendants were simply ignoring Mr. Pennewell. I think the record shows, and I think our brief lays out the timeline well, there's a lot of care that was given here. He was sent out to UW multiple times. He had follow-up visits to UW. So again, I think, you know, it's important to keep in mind that negligence is not the standard. You have to meet a high bar and it requires evidence of the subjective state of mind of these DOC clinicians and that was absent. When he went to see the ophthalmologist, forget his name, the one that operated on his eye, and he described it as he knew exactly what the problem was and apparently fixed it. And then there was a period of time that elapsed and then he went back and saw the ophthalmologist. There's a point at which it seems he was getting a lot of attention and care. Perhaps at the beginning was there something that should have been done sooner, I guess is the impression I would have. Sure. I mean, I think that's an accurate way of characterizing the record. On April 7th is when he first went to UW for, April 7th, 2015 is when he first went for surgery at the University of Wisconsin. He first entered DOC custody, I believe, at the beginning of February. So there was about a, February, March, about a two-month period upon his intake to DOC before he received the surgery. But again, I think what it's critical to remember about that time period, that two months before he was sent out for surgery, is that even then, very soon after his intake into custody, he had seen a specialist who did not think that he needed immediate surgical care. It's the optometrist. Optometrist, correct. So forgive me, I'm not entirely sure that it was an optometrist and ophthalmologist, but I think they both count as specialists. And if an optometrist sees Mr. Starnes, I think it's asking a lot of a nurse to see him in a prison setting and second guess, effectively, is what we'd be requiring these nurses to do, is second guess what the specialist had said. And again, I just don't think that comes close to deliberate indifference. Thank you so much. All right. Mr. Starnes? Good morning. Good morning to the panel. Charles Starnes of Labe Nott Gainer on behalf of Apelli, Dr. James Penuel, excuse me, Dr. James Richter. Dr. Richter saw Mr. Penuel for the first time on February 11, 2015, when he performed an eye exam. At that time, there was no objective evidence of a retinal detachment. Over seven weeks later, on April 7, 2015, Mr. Penuel received a retinal detachment repair procedure performed by Dr. Altaweil. Dr. Altaweil provided a declaration in which he says that Mr. Penuel reported to him that less than two weeks prior, he began experiencing the telltale signs of a retinal detachment. This was over five weeks after Dr. Richter. Later in September of 2015, Dr. Richter saw Mr. Penuel for a second time. During that meeting, Mr. Penuel also discussed the development of his retinal detachment symptoms and again stated that they occurred mere days before his retinal detachment surgery in April. These admissions were not contradicted at any point before the court below or by counsel before the appellate court. They are admissions now. They are uncontroverted. The plaintiff points to his complaint as acting as an affidavit. However, his affidavit doesn't speak to the admissions that he made to both of his treating physicians. In both of those, he admitted that the symptoms of his retinal detachment occurred mere days before his surgery. Based off these uncontested facts and these admissions, it cannot be that the district court improperly found that Dr. Richter was deserving of summary judgment when no retinal detachment symptoms could have existed at the time. Thank you. Thank you. Okay, Mr. Petrie, you have two minutes and 16 seconds. We'll make that three. You can make it just three. No, three minutes. Maybe he only has a minute he wants to talk. I appreciate the three minutes, Your Honor. Up to three minutes. On rebuttal, I just want to raise a couple of points. The first is the state and Dr. Richter's counsel argued that there was no evidence that any of the defendants knew of Mr. Pennywell's claims. But again, pointing to the complaint in this case, Mr. Pennywell asserts under oath, he asserted in his complaint that he told each of the defendants much earlier than they claim, much earlier than April 6th. And at a minimum, at least with regard to Nurse Jackson, Mr. Pennywell told Nurse Jackson through the health services complaint system on March 30th that he felt a tear in his eye. And that was against the backdrop of loss of vision and flashes of light. And as Your Honor noted, this wasn't a plaintiff who is a malingerer. This is someone who has a long history of eye problems and who knew what he was talking about. He understood what his eye felt like. And at a minimum, this raises a dispute of material fact as to when the defendants knew and what they knew. Moreover, it's not enough for Nurse Jackson to have deferred to Dr. Richter's initial assessment. After weeks had gone by and Mr. Pennywell was complaining of a new symptom, the feeling of a tear and severe pain in his eye, it wasn't enough for Nurse Jackson to simply send Mr. Pennywell back to his cell with instructions to wash his hands. Mr. Pennywell did not see a doctor that day, and he should have. He should have received emergency care for the symptoms he was describing. And regardless, all of this underscores the need for counsel in this case. Mr. Pennywell was prejudiced by the lack of counsel. And with counsel, Mr. Pennywell could have built a much stronger record as to these defendants, as to other defendants, and with other claims. Something as simple as including in the record what the minimal standard of care expected in this context. He could have conducted depositions. All of that would have helped his position. And finally, briefly, to Judge Bower's suggestion, another point on remedy, it would be enough in this case to simply vacate summary judgment and revert to the district court pre-discovery with instructions to appoint counsel. It's not necessary that the court today find conclusively that there is evidence in the record of deliberate indifference. It's enough to simply remand to the district court. Thank you. One quick question, and that is if they did have counsel, and counsel were to come in and do all things sooner, is it possible that the ophthalmologist would have said, we've done all we can? That's possible, but even in that instance, if that's what Dr. Richter says in his deposition, that is a dispute of fact that should have gone to a jury. It's inappropriate for the district court to weigh in on the credibility of Mr. Pennywell's evidence versus the defendant's evidence. We therefore ask this court to reverse. Thank you very much. I want to, you were appointed, and I want to thank you, and I want to thank Ms. Konsky, Mr. Strauss, for taking on this obligation and for doing such a splendid job, and I want to thank all your friends that came through, because it's really great to have a cheering section. Where's your cheering section? I want to thank, and I want to thank the two of you as well. Thank you. The case will be taken under advisement.